**METROPOLITAN NASHVILLE AND DAVIDSON COUNTY SCHOOL SYSTEM, Plaintiff,**

v.

**Joel GUEST, Defendant.**

**No. 3:94–0976.**

United States District Court, M.D. Tennessee, Nashville Division.

Oct. 5, 1995.

---

Cynthia C. Tyler, Metropolitan Legal Department, Nashville, TN, John D. Kitch, Kitch & Garman, Nashville, TN, for plaintiff.

Gary D. Buchanan, Tennessee Protection and Advocacy, Inc., Nashville, TN, for defendant.

## MEMORANDUM OPINION

WISEMAN, District Judge.

Joel Guest is a five-year-old autistic Nashville child. His autism essentially garbles the sensory information his brain receives. Sounds, touches, and sights that most children would recognize and from which they would learn have no consistent meaning to Joel. As a result, he does not learn in the same manner as other non-autistic children. Without focused assistance, he learns little at all.

In the fall of 1991, before Joel's autism was diagnosed, his parents, Bob and Sara Guest, enrolled him in the Belle Meade United Methodist Church Children's Center ("Belle

Meade"), a private day-care facility in Nashville. Upon diagnosis of Joel's autism, and his reaching the age of three, Bob and Sara began an effort to secure educational services for Joel from the Metropolitan Nashville and Davidson County School System ("Metro") under provisions of the Individuals with Disabilities Education Act ("IDEA"). For more than two years, the parties have struggled to reconcile Joel's needs, the resources of both Metro and the Guests, and the commands and aspirational language of the federal statute.

In the spring of 1994, the parents requested and obtained a due process hearing before an administrative law judge appointed by the Tennessee Department of Education to adjudicate their grievances with Joel's individualized education programs ("IEPs"), the implementation of services thereunder, and Metro's refusal to reimburse the Guests for certain costs they had incurred, most notably tuition at Belle Meade. On October 12, 1994, the ALJ made the following findings and reached certain conclusions at law:

(1) Metro failed to adequately identify Joel as a child in need of special education services and then failed to evaluate his disabling condition. 34 C.F.R. § 300.220.

(2) Metro failed to provide occupational therapy as required by Joel's own IEP according to the requirements of 20 U.S.C. § 1401(a)(17–18).

(3) Metro was liable to reimburse the Guests for expenses they had incurred, including $2,802 in tuition at Belle Meade, $743 for speech therapy at the Bill Wilkerson Hearing & Speech Center, $760.15 for additional speech therapy at High Hopes, Inc., and $2,441.70 for the services of a private occupational therapist at High Hopes.

(4) Metro was required to provide the services described in Joel's August 26, 1993, IEP at Belle Meade.

■ Metro now seeks to overturn the decision of a state administrative law judge finding. Joel urges the Court to affirm the ALJ. This Court reviews the ALJ's factual findings and conclusions at law under a modified *de novo* standard, granting them "due weight" where appropriate. *Doe v. Bd. of Educ. of*

*Tullahoma City Schools,* 9 F.3d 455, 458 (6th Cir.1993). As with all IDEA disputes, the extent and nature of the "free appropriate public education," 20 U.S.C. § 1401(a)(18), to which Joel is entitled, both procedurally and substantively, is at the heart of the Court's review.

## I. IDENTIFICATION AND EVALUATION

The IDEA requires local educational units, such as Metro, to adopt procedures providing that all children residing within the jurisdiction of the school system needing special education "will be identified, located and evaluated...." 20 U.S.C. § 1414(a)(1)(A); 34 C.F.R. § 300.220.

■ Joel's parents placed him in Belle Meade in September 1991, when he was 18 months old. In August 1992, doctors at the Child Development Center at Vanderbilt University diagnosed Joel as autistic. Six months later, on February 23, 1993, the Guests and Vanderbilt's Project Blend referred Joel to Metro for evaluation under the IDEA. The referral came 12 days before Joel's third birthday, when he became eligible for special educational services under the IDEA. *See* 34 C.F.R. § 300.300(b)(1) (requiring the state to provide a free appropriate public education to all children between the ages of 3–5 if state law authorizes such services to any disabled child in that group) and Tenn.Comp.R. & Regs. 0520–1–3–.09(1)(hh) (defining IDEA-eligible "school age children" as persons age 3–21).

Sara Guest testified before the ALJ that she heard nothing from Metro for two months after her referral until she contacted Metro officials in April 1993. Doris Taylor, Metro's special education consultant, testified that she first learned of Joel's referral by accident that same month in a routine search of her files. In any event, Metro failed to convene its first M–Team for Joel until June 2, 1993, when the team determined Joel was eligible for Metro's special education services.

The IEP developed for Joel at the June 2 meeting identified his "handicapping condition" as "language." The IEP, which ad-

dressed only Joel's summer plans, provided for up to three hours per week with a speech & language specialist. Both Bob and Sara Guest signed the IEP, indicating their approval and inserting the words "for the summer program." It was not until Joel's M–Team prepared a new IEP in August 1993 that his handicapping condition was listed as autism and services planned accordingly.

It is the delay in identifying Joel from his referral of February 1993 and the delay in evaluating his autism until August 1993 that the administrative law judge noted in his ruling against Metro. The Court concurs and holds that Metro's two-month delay in identifying Joel and its subsequent four-month delay in properly evaluating him indeed violated the local education unit's responsibilities under § 1414(a)(1)(A).

■ The Sixth Circuit has recognized that "technical defects do not result in a violation of IDEA if there is no substantive deprivation." *Chuhran v. Walled Lake Consol. Schools,* 22 I.D.E.L.R. 450, 451, 1995 WL 138882 (6th Cir.1995). Six months without appropriate services, however, is one-sixth of a three-year-old's life. If § 1414's requirements are to mean anything, they should be given particular importance at the critical early stages of a child's development. And while § 1414 establishes procedural requirements, the first prong of the now-familiar two-part test of *Hendrick Hudson Bd. of Educ. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) makes clear that procedural violations invoke a district court's remedial powers under the IDEA just as substantive violations do. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3050–51.

Granted, the administrative and financial burdens of identifying and evaluating all three-year-old children requiring special education services within Metropolitan Nashville–Davidson County's population of a half-million is onerous. Given the pressing need to improve public education for all Tennessee children, it may well be, in this Court's can-

did view, an inefficient allocation of all-too-scarce resources. It is, nonetheless, an optional burden the state of Tennessee has accepted for itself on behalf of its local school districts. Tenn.Comp.R. & Regs. 0520–1–3–.09(1)(hh). Once assumed, compliance is not optional.

The remedy for this violation is nonetheless perplexing. Once a child such as Joel is receiving appropriate services, it is not clear what can remedy a two-year-old procedural violation. If Joel's current IEP represented, as it ought, the best Metro, Belle Meade, and the parents could do given Joel's current condition and progress, taking into account the lost six months, the best remedy would be simply to enforce it. As is evident from this litigation, however, the Guests are unsatisfied with Joel's IEP.

It appears the ALJ considered all the violations he found, substantive and procedural together, in fashioning his remedy.[1] Given the issues raised below, this Court will do likewise *infra,* considering Metro's apparent failure to identify and evaluate Joel's disability under its broad remedial powers "to grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

## II. OCCUPATIONAL THERAPY

The occupational therapy question is one of educational propriety and requires an interpretation of the IDEA's appropriateness requirement.

■ Whether Joel's IEPs meet the test of 20 U.S.C. § 1401(a)(18) of a free appropriate public education for a disabled child is subject to *Rowley's* two-part test:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has com-

---

**1.** The ALJ ordered Metro to provide Joel 19.5 hours per week with special education teachers, three hours per week with a speech language therapist, and two hours per week of occupational therapy—essentially the August 1993 IEP rec-

ommendation, with the exception of the occupational therapy and that the services be provided at Belle Meade. The ALJ also ordered Metro to reimburse the Guests for their out-of-pocket costs, a topic taken up below in Part IV.

plied with the obligations imposed by Congress and the courts can require no more. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3050–51; *Doe By and Through Doe v. Defendant I,* 898 F.2d 1186, 1188 (6th Cir.1990).

The Sixth Circuit recently set out in *Tullahoma City Schools* what it understands *Rowley* to mean by "reasonably calculated to enable the child to receive educational benefits":

> The Act requires that the Tullahoma schools provide the educational equivalent of a serviceable Chevrolet to every handicapped student. Appellant, however, demands that the Tullahoma school system provide a Cadillac solely for appellant's use. We suspect that the Chevrolet offered to appellant is in fact a much nicer model than that offered to the average Tullahoma student. Be that as it may, we hold that the Board is not required to provide a Cadillac, and. that the proposed IEP is reasonably calculated to provide educational benefits to appellant, and is therefore in compliance with the requirements of the IDEA.

*Tullahoma City Schools,* 9 F.3d at 459–60.

■ The question in this case is whether the certified occupational therapist assistant who worked with Joel was a serviceable Chevrolet or, as his parents contend, a Yugo. The Court finds Metro satisfied the Chevrolet standard.

Occupational therapy is one of the "related services" the IDEA includes in its definition of a free appropriate public education. 20 U.S.C. § 1401(a)(17)(18); *see also* 20 U.S.C. § 1400(c) (stating "[i]t is the purpose of this Act to assure that all children with disabilities have available to them … a free appropriate public education which emphasizes special education and related services"). The regulations implementing the IDEA define occupational therapy as:

> (i) Improving, developing or restoring functions impaired or lost through illness, injury, or deprivation;

> (ii) Improving ability to perform tasks for independent functioning when functions are impaired or lost; and

> (iii) Preventing, through early intervention, initial or further impairment or loss of function.

34 C.F.R. § 300.16b(5). The propriety and extent of occupational therapy are decided on a case-by-case basis. 20 U.S.C. § 1401(a)(20).

Joel's December 13, 1993, IEP provided, for the first time, that he receive a half-hour per week of occupational therapy "to address Joel's sensory motor/fine motor skill development at this time." IEP of Dec. 12, 1993, at 4. Under the heading "Person or Agency Responsible" for Joel's occupational therapy is the notation "OTR/COTA," which stands for "Occupational Therapist Registered/Certified Occupational Therapist Assistant." Sara Guest signed her approval to this IEP.

Sara Guest testified that Joel's occupational therapy sessions did not begin until January 11, 1994. Once they began, Joel received twice weekly 45–minute sessions from a certified occupational therapist assistant under contract with Metro. Direct Testimony of Sara Guest, Transcript of the Administrative Proceedings Before the Tennessee Department of Education 58 (Aug. 2, 1994). At Joel's March 1, 1994, M–Team meeting, all the participants engaged in a lengthy debate over the registered therapist versus therapist assistant issue. Transcript of March 1, 1994, M–Team Meeting at 10–29.[2]

Mrs. Guest argued that a registered occupational therapist, Agaath Van Dorp of High Hopes, Inc., was more capable of providing the services Joel needed, particularly sensory integration therapy. Metro officials argued that the therapist assistants employed by the company with which it contracted to provide occupational therapy were well-trained in sensory integration and supervised by a registered occupational therapist with training and experience similar to Van Dorp. *Id.*

---

**2.** The Guests tape-recorded their M–Team meetings and transcribed the tapes. Both the tapes and transcriptions were entered into evidence before the ALJ over Metro's objection. This Court considers the transcripts and tapes as part of the entire administrative record on appeal. 20 U.S.C. § 1415(e)(2).

The debate was unresolved, at least to Joel's mother, who employed Van Dorp to supplement Metro's services. Mrs. Guest testified at the ALJ hearing that she had spent $2,441.70 as of August 1994 for Joel's private occupational therapy and the ALJ ordered Metro to reimburse her in that amount.

Mrs. Guest's dissatisfaction notwithstanding, Linda Seiter, the lead occupational therapist for Rehab Group, Inc., Metro's contract occupational therapy agency, testified before the ALJ that the certified occupational therapist assistant working with Joel had success:

> He has been doing well. He has made some progress, and it is slow. It is steady. He has begun to initiate sounds, approximating the activity or the object that he is relating to at the time. He is following directions better, verbal directions, without any cuing. He attends to task somewhat better. That fluctuates a lot, because of the kind of day he is having. On the whole, I think he has shown some significant improvement as far as relating to objects and demonstrating purposeful movements on cue, which was not always the case, I understand, prior.

Direct Testimony of Linda Seiter, Transcript of the Administrative Proceedings at 378.

Seiter's testimony is uncontradicted. The Guests simply respond that more is necessary to enable Joel to learn. They may be right. But that is not a question properly before this Court nor is it a question answered by the IDEA for at least two reasons.

First, occupational therapy is always controversial because, despite its inclusion in IDEA as a "related service," it has elements of medical treatment about it as well. *See generally* Cynthia A. Dieterich, *Health–Related Services Under IDEA that are Medical in Nature,* 100 Ed.Law Rep. 831 (1995); David C. Donohue, Clovis Unified School District v. California Office of Administrative Hearings: *Restricting Related Services Under the Individuals with Disabilities Act,* 8 J.Contemp.Health L. & Pol'y 407 (1992). The Act specifically states that a free appropriate public education does not include medical services beyond evaluation and diagnosis. 20 U.S.C. § 1401(a)(17); *Irving Indep.*

*School Dist. v. Tatro,* 468 U.S. 883, 891–93, 104 S.Ct. 3371, 3376–78, 82 L.Ed.2d 664 (1984). The Guests' request, and the ALJ's order, arguably cross the line between educational services and medical treatment.

■ Secondly, while Joel's educational progress is important to everyone involved in this case, the IDEA does not require Metro to maximize his gains. *Tullahoma City Schools,* 9 F.3d at 459–60. Metro, in fact, offered the Guests alternative occupational therapy services at Harris–Hillman School, where therapists work with a larger number of children and appropriate equipment is more readily available.

The Sixth Circuit's admonition in *Tullahoma City Schools* is relevant here; the IDEA does not require Metro to provide Joel and his parents a Cadillac, merely a serviceable Chevrolet. And that, the Court finds, they have done. This Court, therefore, REVERSES the ruling of the ALJ ordering Metro to reimburse the Guests $2,441.70 for the costs of Joel's private occupational therapy.

## III. REIMBURSEMENT FOR TUITION

In order to determine whether the Guests are entitled to reimbursement for tuition costs, the Court must first make a factual determination whether Joel's IEP placed him at Belle Meade within the meaning of the IDEA. The Court must then consider the legal question of whether the IDEA requires Metro to reimburse the Guests for the tuition they have paid Belle Meade. The answer to the factual question bears significantly on the manner in which the Court must answer the legal question. For if Metro acts through an IEP to place a child in a private setting, Metro must pick up the tab.

> [C]hildren with disabilities in private schools and facilities will be provided special education and related services (in conformance with an individualized education program as required by this subchapter) *at no cost to their parents or guardian, if such children are placed in or referred to such schools or facilities by the State or appropriate local educational agency* as

the means of carrying out the requirements of this subchapter....

20 U.S.C. § 1413(a)(4)(B) (emphasis added).

The same is not true when the parents unilaterally place the child in a private setting. Regulations of the U.S. Department of Education implementing the reimbursement provisions of the IDEA underscore the importance of this distinction:

> If a child with a disability has [a free appropriate public education] available and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility. However, the public agency shall make such services available to the child as provided under §§ 300.450–300.452.

34 C.F.R. § 300.403(a). The last sentence of this regulation appears to draw a distinction between private school tuition and ancillary services the state might provide. Sections 300.450–300.452 require the state or local education unit to provide "special education and related services" to children with disabilities enrolled by their parents in private facilities. 34 C.F.R. §§ 300.450–300.452.

■ A parental placement does not, however, automatically disallow a claim for private reimbursement. The Supreme Court has held that parents who reject an inadequate IEP and place their child in a private school are nonetheless entitled to reimbursement.

> [T]he parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.

*School Comm. of the Town of Burlington v. Dep't of Educ. of Massachusetts*, 471 U.S.

359, 370, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985).

In a *Burlington* case, however, the court must find the IEP so improper that the parents have no choice but to refuse the school system's offer and remove the child elsewhere. *See Tullahoma City Schools*, 9 F.3d at 461; *Roland M. v. Concord School Comm.*, 910 F.2d 983, 999–1000 (1st Cir.1990) (both denying private-school reimbursement claim when public-school IEP placement appropriate).

Therefore, the statute, regulations, and *Burlington* pose two threshold questions before the Court. First, did Metro or the Guests place Joel at Belle Meade and, if the answer to question one is the Guests, was Joel's IEP inappropriate under *Rowley* and the Sixth Circuit's most recent statement in *Tullahoma City Schools* as to merit reimbursement anyway.

■ The ALJ did not address the first question; this Court considers the matter *de novo*. Metro has a straightforward argument: The parents enrolled Joel at Belle Meade before any referral to Metro; therefore, the parents are responsible for the placement and § 1413(a)(4)(B) is not invoked.

This argument is undoubtedly true, but only to a point. There is no dispute the Guests enrolled Joel prior to any Metro referral and that he received services there during the summer of 1993 under his initial IEP. However, Joel's first school-year IEP, written August 26, 1993, placed him at the Early Childhood Education Center at Martha Vaught School, a Metro site, for one hour weekly consultation with a speech/language specialist, three hours weekly with a small group of students working with a speech/language specialist, and three days a week with a special education teacher (Joel remained at Belle Meade two days a week). Sara Guest indicated that she agreed with the Martha Vaught placement, though she added language next to her signature: "We have reservations but need placement until something more appropriate can be worked out."

The point at which Metro's argument appears to no longer hold is Joel's next M–Team meeting October 12, 1993. By this

time, the Guests clearly were unsatisfied with the Martha Vaught placement. Sara Guest noted problems both with student-teacher ratios and the fact that all the children in the Martha Vaught setting were disabled, whereas Joel's age peers at Belle Meade were predominantly children with no learning disabilities, a setting she preferred. She sought to have Joel returned to Belle Meade full time. Transcript of October 12, 1993, M-Team Meeting at 1.

According to the M-Team transcripts, state and Metro education officials attending the October 12 meeting appeared to have accepted Sara's proposal to place Joel at Belle Meade full-time:

> We're looking at, unless someone else has a problem with it—of leaving Joel at the daycare with the speech and language services that have already been in place and the consultation that has already been in place. Providing consultation from a preschool teacher who has been working with the 3–year–olds to the staff, if they feel that it's needed and also do the occupational therapy evaluation.... Unless you have any problems or objections to that or anyone wants to add any other information, that's, you know, that's what we're offering at this particular time. And it seems to be what everybody has requested.
>
> . . . . .
>
> [A]s far as Joel's being at Belle Meade, we have no problem with that. Providing the speech and language services there, we have no problem with that. Uh, the consultation with the speech and language therapist with the classroom teacher, we already have that in place, and we want to continue that.

*Id.* at 4, 9 (remarks of Doris Taylor, Metro Special Education Consultant).

> One of the things I think is so wonderful about the placement is, [ ] he's in a different classroom this year, but last year the classroom that he was in [at Belle Meade], he actually developed friendships. Children would come over and initiate contact with him and they really developed rapport, and they would play together. And there was some initiated play on Joel's

part. This year that's being established. It takes a while for that to develop. But that's just very encouraging to me.

*Id.* at 5 (remarks of Pat Decker, Tennessee Department of Education).

> Let me go back and review what we have done to be sure I've got a clear understanding and you have a clear understanding of what we're doing. One, is to maintain the speech therapy services on campus at your center. With consultative services from a speech and language therapist—from the teacher—from the therapist to the classroom teacher. Two, to provide consultative services with some observations from a preschool teacher with experience with autistic children, and all, for consultative as well as provide any other input and answer questions that they may have on that.... To also look at question of providing a one-on-one assistant until training can be done.

*Id.* at 21 (remarks of Doris Taylor).

Joel's IEP prepared at the October 12 meeting echoes Taylor's final above-quoted comment:

> The M-Team met to reconsider program recommendation of 8/26/93 M-Team. At today's meeting it was recommended that Joel remain in LRE [least restrictive environment] of Belle Meade Children's Center ... with speech/language direct services, staff consultation, and consultation from pre-school teacher with experience dealing with teaching of autistic students.

IEP of October 12, 1993, at 2. When Taylor was cross-examined by Joel's attorney before the ALJ about this IEP statement, she maintained the October 12 IEP placed Joel nowhere. The following discussions took place:

> Q [Guest attorney]: So you are saying then that this paragraph that you wrote and recorded here [on the IEP] is not true?
>
> A [Doris Taylor]: Let me read it again. At today's meeting, it was recommended that he remain in the least restrictive environment of Belle Meade Children's Center. We are not saying that we placed him there, and all, and, again, I wrote the

L.R.E. there, not for educational use, but you are interpreting it differently.

Q: You mean in this I.E.P. when you use the word least restrictive environment, you did not mean that in the sense of education?

A: Not in terms of his educational placement; no.

Q: Okay. So you are saying that this document says that his educational placement is somewhere other than Belle Meade; is that correct?

A: Yes.

Q: And where does this document say his educational placement is, if it is not in Belle Meade?

A: It does not say that he is in any other educational placement at all.

. . . .

Q: Joel has speech/language goals; correct?

A: Yes, he does.

Q: He has occupational therapy goals; is that correct?

A: Yes, he does.

Q: Does he have any other goals and objectives?

A: No. Only service-related goals.

Q: Why not?

A: Because we are not providing the educational programming for him at Belle Meade. The educational goals were written into the one that was developed August 26, for the early childhood educational programming.

Q: Well, if you look at the I.E.P. of October 12, and directing your attention to page 112.

A: Okay. It says continue current I.E.P. goals. Yes.

Q: And isn't that referring to the I.E.P. of 8/26/93?

A: Yes, it is.

Q: So what you just said a few minutes ago was completely untrue, isn't that correct?

A: I'm looking at this. To be very honest; yes.

Cross–Examination of Doris Taylor, Transcript of the Administrative Proceedings at 338, 341–42.

Future M–Team meetings and IEPs never raised the question of placement again, merely the level and nature of services Joel was to receive at Belle Meade. Taken together, then, the IEPs, M–Team transcripts, and Taylor's testimony pose three possibilities, only one of which is proper under the IDEA:

(1) Metro placed Joel nowhere.

This position, taken by Taylor at the administrative hearing, is not only implausible, it would be an admission that Metro had failed to meet its responsibilities under 20 U.S.C. § 1412(5)(B) and 34 C.F.R. § 300.552(a) to place Joel within a year of developing his IEP. *See also* Tenn.Comp.R. & Regs. 0520–1–3–.09(4)(b)(2) (stating that M–Teams are responsible for both IEPs and placements). *C.f.* Tennessee Department of Education, Division of Special Education, *Administrative Policies and Procedures Manual* 30 (Jan.1994) (permitting only 40 days between referral and placement).

(2) Metro placed Joel at Martha Vaught School in August 1993 and never moved his placement.

This is also implausible and illogical, given that all of Joel's services were delivered at Belle Meade. Metro's insistence on this position forces an admission that Metro violated 20 U.S.C. § 1415(b)(1)(C) because, according to Taylor's own testimony, Metro never notified the Guests in writing that it was refusing the recommendation of the M–Team and the request of the Guests to change Joel's placement from Martha Vaught to Belle Meade. Transcript of Administrative Proceedings at 333. *C.f. Union School District v. Smith*, 15 F.3d 1519, 1526 (9th Cir.1994) ("The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to support a placement, if any.").

(3) Metro placed Joel at Belle Meade.

The final possibility, though by no means irrefutable, is the only logical conclusion giv-

en the evidence before the Court. It is also consistent with Taylor's admission of Metro policy and practice in place at the time of Joel's October 1993 IEP to place and fund disabled preschool children in private settings. Transcript of Administrative Proceedings at 331–33. It is the only conclusion consistent with the comments of Pat Decker, the Tennessee Department of Education's technical assistant, who said at the October 1993 M–Team meeting that the state wanted "to support this kind of placement" and that by providing special ed training to Belle Meade's day care staff, "we're talking about a real total change in how we're providing services. And so the spotlight's kind of on this one." Transcript of October 12, 1993, M–Team Meeting at 30–31.

The Court finds that Metro did, indeed, place Joel at the Belle Meade Children's Center by the October 12, 1993, IEP. Such a finding renders the question of the appropriateness of the IEP moot and requires Metro to pay the costs of Joel's placement under the October 1993 IEP and subsequent IEPs maintaining his placement at Belle Meade. 20 U.S.C.·§ 1413(a)(4)(B).

## IV.  REMEDIES & CONCLUSION

In sum, the Court:

1.  Reverses the ruling of the ALJ ordering Metro to reimburse the Guests $2,441.70 for privately obtained occupational therapy services.

2.  Affirms the ALJ's order requiring Metro to reimburse the Guests for the amount of tuition paid to Belle Meade. The Court orders Metro to pay the Guests an amount equal to Joel's tuition from October 12, 1993, to the present. The proof before the Court does not show this amount because the parents originally sought reimbursement for tuition dating from Joel's third birthday to the ALJ hearing. Joel's attorney is, therefore, required to submit proof of tuition costs from October 12, 1993, to the present so that judgment may issue.

3.  Modifies the ruling of the ALJ ordering Metro to reimburse the Guests a total of $1,503.15 for speech therapy services at High Hopes, Inc., and the Bill Wilkerson Center.

The proof shows that many, though not all, of these services were obtained during the six months while Joel awaited proper identification and evaluation by Metro. Guest Letter to Metro, Exh. 1 inclusive (Feb. 7, 1994). The Court, therefore, orders Metro to reimburse the Guests only for costs of services rendered from March 12, 1993, Joel's IDEA eligibility date, until August 26, 1993, the date of his first IEP evaluating his autism. Given the constant level of services provided Joel for speech and language therapy, post-August 1993 reimbursement for services is inappropriate. Joel's attorney will also make a proffer of these costs to the Court for final judgment.

Finally, the Court orders an immediate reconvening of Joel's M–Team to develop new goals and objectives for his education, including explicit statements of placement for all services. The IDEA is based upon a model of cooperation and partnership among parents, educators, and experts. The record of this case, replete with charges of evasions and obfuscations, suggests that clearly stated goals and placements will reduce future tension and move the parties toward the ideal of the IDEA. Metro will, therefore, submit Joel's new IEP, developed according to these parameters, to the Court within 30 days, not for substantive judicial review, but simply to demonstrate compliance with this order.

It is so ORDERED.

## ORDER

This matter is an appeal brought by the Metropolitan Nashville and Davidson County School System of a ruling by an administrative law judge under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, in the matter of Joel Guest.

The Court has reviewed the pleadings and the entire administrative record, including exhibits. The Court also heard oral argument by counsel July 31, 1995. The Court now:

1.  REVERSES the ruling of the ALJ ordering Metro to reimburse the Robert and Sara Guest $2,441.70 for privately obtained occupational therapy services.

2.  AFFIRMS the ALJ's order requiring Metro to reimburse the Guests for the

amount of tuition paid to Belle Meade. Metro will pay the Guests an amount equal to Joel's tuition from October 12, 1993, to the present. Counsel for Joel Guest will submit proof of Joel's tuition costs from October 12, 1993, to the present so that judgment may issue.

3. MODIFIES the ruling of the ALJ ordering Metro to reimburse the Guests a total of $1,503.15 for speech therapy services at High Hopes, Inc., and the Bill Wilkerson Center. Metro will reimburse the Guests for costs of services rendered from March 12–August 26, 1993. Counsel will also make a proffer of these costs to the Court for final judgment.

The Court also orders an immediate reconvening of Joel's M–Team to develop new goals and objectives for his education, including explicit statements of placement for all services. Metro will submit a new IEP, developed according to these parameters, to the Court within 30 days, not for substantive judicial review, but to demonstrate compliance with this order.

It is so ORDERED.