Because plaintiffs have failed to show that the IEP is inappropriate, they are not entitled to reimbursement for the costs of B.J.'s DTT program.    *See School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 374 (1985). Furthermore, because B.J. was offered a FAPE, the district court was correct in dismissing the remaining claims.

## III.

For the foregoing reasons, the judgment of the district court is **affirmed**.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0119P (6th Cir.)
File Name:  00a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

EDWIN BURILOVICH; LINDA
BURILOVICH, as next friends
on behalf of their son, Bradley
Burilovich,
          *Plaintiffs-Appellants,*

          *v.*

BOARD OF EDUCATION OF THE
LINCOLN CONSOLIDATED
SCHOOLS; RON GREINER,
individually,
          *Defendants-Appellees.*

No. 98-2187

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-72191—Bernard A. Friedman, District Judge.

Argued:  November 4, 1999

Decided and Filed:  April 4, 2000

Before:  KEITH, NORRIS, and  CLAY, Circuit Judges.

———————

### COUNSEL

**ARGUED:** Richard J. Landau, DYKEMA GOSSETT, Ann Arbor, Michigan, for Appellants. Michael A. Eschelbach, THRUN, MAATSCH & NORDBERG, Lansing, Michigan, for Appellees. **ON BRIEF:** Richard J. Landau, DYKEMA GOSSETT, Ann Arbor, Michigan, for Appellants. Michael A. Eschelbach, Timothy R. Winship, THRUN, MAATSCH & NORDBERG, Lansing, Michigan, for Appellees.

———————

### OPINION

———————

ALAN E. NORRIS, Circuit Judge. Plaintiffs Edwin Burilovich and Dr. Linda Burilovich ("plaintiffs"), acting on behalf of their autistic son Bradley ("B.J."), sued the Board of Education of the Lincoln Consolidated Schools and its special education director ("defendants") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et. seq. Plaintiffs challenge the district court's grant of summary judgment for defendants, maintaining that a proposal to place B.J. in a mainstream kindergarten violated procedural and substantive provisions of the IDEA. For the following reasons, we affirm the judgment of the district court.

### I.

B.J. was born on November 15, 1990. At an early age, his parents noticed that his language skills were significantly delayed. When he was three, plaintiffs sought assistance from their local school district, Lincoln Consolidated Schools. B.J. was evaluated by a Multidisciplinary Evaluation Team ("MET") at Willow Run Community Schools, which was providing Preprimary Impaired ("PPI") services for Lincoln. The MET generated an Individualized Education Program ("IEP"), providing B.J. with nonclassroom PPI services, along with speech and language therapy.

for B.J. Dr. Burilovich felt that when B.J. had less DTT, he tended to be less social, to engage in less speech, and to increase his self-stimulation. She felt he was very different in school, and that he would be totally overwhelmed in a mainstream class. Dr. Meinhold testified that B.J. would not benefit from mainstream kindergarten, even with a one-to-one paraprofessional. Dr. Holmes also indicated that DTT would be better than kindergarten for B.J., noting that B.J. would not benefit from being with peers until he developed better communication skills.

The district's witnesses, on the other hand, saw problems with DTT. Dr. Mesibov indicated that the DTT proposal emphasized B.J.'s deficits, not his strengths, and that isolating B.J. would only make his social relationships worse. Mr. Greiner stated that the staff never wanted the DTT proposal because they thought it would be bad for B.J. Some of the concerns expressed over the proposal were that DTT, unlike the school program, did not account for a natural environment, peer reinforcement, or independence. Staff members also had problems with DTT because it appeared to be a package deal, without individualization for B.J. Even Dr. Meinhold acknowledged that B.J. would learn in kindergarten, just not in his area of weakness.

The district court reviewed the testimony and concluded that the school's proposal was the only one tailored to B.J.'s needs, holding that the SHO's findings were well supported by the evidence. Given the differing opinions on both sides as to the best program for B.J. and the reasonable bases in the record for the opinions, we emphasize that courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Giving due weight to the SHO's decision, we conclude that the IEP was designed to allow B.J. to achieve his maximum potential. *Cf. Renner*, 185 F.3d at 644-46 (finding IEP substantively valid under similar circumstances).

will be defective if it fails specifically to address regression, nor do plaintiffs posit any argument that would persuade this court that we should so hold.

Plaintiffs further maintain that the district court improperly resolved a material question of fact by deferring to the SHO's decision perceived by the court as discrediting plaintiffs' expert, Dr. Meinhold. Review of the SHO's opinion reveals that, while the SHO said that he discounted (not "discredited") Dr. Meinhold's testimony, the SHO actually did consider her proposed DTT package when assessing whether B.J.'s unique needs were met. There is no issue of material fact because the SHO's findings did take into account Dr. Meinhold's views. After independent review of the record, and giving due weight to the SHO's decision, we agree with the SHO's conclusion.

*7.    Whether the IEP was Designed to Allow B.J. to Attain his Maximum Potential*

Plaintiffs maintain that there was conflicting testimony addressing the question of whether the IEP would allow B.J. to attain his "maximum potential." Plaintiffs suggest that the only expert opinion based upon a professional, individual assessment of B.J. showed that he needs an intensive program of individualized, one-to-one instruction. Plaintiffs note that defendants' expert, Dr. Gary Mesibov, had never met B.J., while plaintiffs' experts, Drs. Meinhold and Holmes, had met and observed B.J. Plaintiffs also indicate that other defense witnesses included school district staff, some of whom had never met B.J. or who had only met him once. Plaintiffs reiterate their assertion that the IEP was based on the availability of resources and experience of school personnel, not B.J.'s needs. Plaintiffs also cite several cases approving of DTT. Finally, plaintiffs maintain that the IDEA's goal that a student be in the least restrictive environment did not weigh in favor of the district's IEP because B.J. was not ready for the fully mainstreamed class suggested by the IEP.

Independent review of the record confirms that the parties had widely differing views of the best method of education

On February 24, 1994, B.J. was evaluated by Dr. Luke Tsai at the University of Michigan Adult/Child Psychiatric Hospitals. Suzanne Boyer, B.J.'s teacher, was present for the last part of the appointment. Dr. Tsai diagnosed B.J. as autistic; Dr. Burilovich later hand-delivered a copy of Dr. Tsai's evaluation to Ms. Boyer. This evaluation was not placed in B.J.'s school file.

Plaintiffs began researching educational approaches to treating autism. They learned of an approach developed by Dr. Ivar Lovaas, called discrete trial training ("DTT"). DTT emphasizes heavy parental involvement, early intervention, and treatment in the home and elsewhere in the community, rather than in professional settings. Plaintiffs started a home-based DTT program for B.J.

In June 1994, Dr. Burilovich wrote to Willow Run's Superintendent, Dr. Yomtoob, expressing her concerns about the downsizing of the Willow Run infant-toddler program and B.J.'s being given only three hours of instruction a week. That letter also indicated that B.J. was autistic.

In September 1994, Lincoln notified B.J.'s parents that it was transferring B.J. from the Willow Run program to the Lincoln PPI program. On October 1, 1994, the parents consulted with Dr. Patricia Meinhold, a psychology professor at Western Michigan University, who concluded that B.J. was an appropriate candidate for DTT and suggested the parents request assistance from their school district. An IEP Committee meeting ("IEPC") was held with the school. The resulting IEP placed B.J. in the district's PPI program 2.5 hours a day, four days a week, with 40-80 minutes per week of speech and language therapy. The parents requested that part of B.J.'s school time be used for DTT, but the district did not include DTT in the IEP. B.J.'s teacher Betsy McMillin offered to, and did, provide DTT therapy for a half hour before the school day began.

B.J.'s home program continued to develop. By Thanksgiving he was receiving at least 20 hours per week of DTT. The parents decided to reduce B.J.'s school

participation to two days a week following Christmas vacation; his time spent on DTT increased to 20-25 hours a week. According to plaintiffs, in the first half of 1995, B.J. made progress with his language and imitative skills, but was not involved in classroom activities. By the last half of 1995, B.J. was averaging 25-30 hours of home-based DTT. On November 28, 1995, Mr. Burilovich visited B.J.'s classroom and made a videotape. The parents maintain that the behavior on the videotape confirmed Dr. Burilovich's concerns that B.J.'s behavior in school was more regressed than at home.

On July 1, 1995, defendant Ronald Greiner became the Director of Special Education for the Lincoln Consolidated Schools. He began working with the Burilovich family in the fall of 1995 and an IEPC for B.J. was held on December 1, 1995. On December 7, 1995, Mr. Greiner sent a letter to plaintiffs memorializing conversations he had with them and setting out the district's perspective on an appropriate program for B.J. The letter also indicated that the parents had mentioned they were having some medical evaluations completed addressing autism, and asked for access to that information. In response, plaintiffs requested an independent educational evaluation ("IEE") by Dr. Meinhold. Plaintiffs later provided Mr. Greiner with a copy of Dr. Tsai's March 1994 evaluation. In January 1996, Mr. Greiner initiated an evaluation of B.J. for autism. The evaluation included some home observation by the school psychologist, school social worker, and Mr. Greiner.

Another IEPC was scheduled for March 18, 1996. Before that meeting, Dr. Meinhold submitted a report that included a formal written program proposal for B.J. At the meeting, Mr. Greiner proposed a program predominantly consisting of DTT, accepting the goals and objectives developed by Dr. Meinhold, and providing for staff training by Dr. Meinhold. According to Mr. Greiner, he proposed the plan involving DTT because he wanted to avoid conflict and a due process hearing. The staff, however, did not support the proposal. While most of the meeting was taped, the proposal was not written in a formal IEP. The parties disagree over the reason

any other program.[5] To support this allegation, plaintiffs point to the testimony of Amy Stamps, the school psychologist, who indicated that the school personnel was not trained sufficiently to provide B.J. with DTT. Ms. Stamps' testimony does not support plaintiffs' assertion, however, because the record indicates that she still had concerns about DTT even when she assumed that personnel could be properly trained.

The district court and the SHO correctly determined that defendants' program took B.J.'s unique needs into consideration. As the district court pointed out, defendants' program set goals for B.J. and created a detailed daily schedule to address each of the goals with a program including both group instruction and one-on-one therapy. In contrast, the court noted that it did not see how the parents' proposed "standard" 40 hours of DTT therapy "was tailored to B.J.'s needs." The court later stated that the "school's proposal is the only one which took into consideration B.J.'s goals and abilities, and developed a plan specifically to accommodate him." After reviewing the record, and giving due weight to the SHO's opinion, we agree with the district court that the IEP did take into account B.J.'s unique needs. *See Renner*, 185 F.3d at 644 (determining that IEP addressed child's unique needs in case involving similar circumstances to the present case).

Plaintiffs also suggest that the IEP did not address B.J.'s unique needs because it did not mention B.J.'s home program of DTT or his potential for regression. They rely on a case in which a district court ruled against a change in placement due to a risk of regression. *See Delaware County Intermediate Unit No. 25 v. Martin K*, 831 F. Supp. 1206, 1229 (E.D. Pa. 1993). We do not read the case as saying that an IEP always

---

[5]Although plaintiffs characterized this issue as a procedural violation, we view it as an alleged substantive violation because the requirement that the IEP be designed to meet the child's unique needs is derived from the definition of "special education" in 20 U.S.C. § 1401(a)(16). *See Dong*, 197 F.3d at 802.

development for chronological age, as measured by more than 1 developmental scale, which cannot be resolved by medical or nutritional intervention. This definition shall not preclude identification of a child through existing criteria within R 340.1703 to R 340.1710 or R 340.1713 to R 340.1715.

*Id.*

The only case cited by plaintiffs to suggest a time limitation is readily distinguishable. In *Metropolitan Nashville & Davidson County School System v. Guest*, 900 F. Supp. 905 (M.D. Tenn. 1995), the court held that a school system had violated its obligations under the IDEA to identify, locate, and evaluate children needing special education by delaying two months in identifying a disabled child and an additional four months in properly evaluating him. The court emphasized that while the Sixth Circuit has recognized that technical defects do not result in a violation of the IDEA if there is no substantive deprivation, "[s]ix months without appropriate services, however, is one-sixth of a three-year-old's life." *Id.* at 908. That case involved the initial identification and evaluation of the child, not the reevaluation at issue with B.J. Plaintiffs maintain that the delay in this case was not just a technical defect, given the more intensive programming available for autistic students. Yet plaintiffs do not suggest how the delay could have caused a substantive problem with B.J.'s IEP, since by the time the March and May IEPCs occurred, B.J. had been certified as autistic. For these reasons, plaintiffs have failed to explain the relevance of the failure to recertify B.J. sooner, even if a time limitation was applicable.

### 6. B.J.'s Unique Needs

Plaintiffs suggest that the IEP failed to take B.J.'s unique needs into consideration, asserting that the district proposed the IEP because its personnel had insufficient experience for

why there was no written document. Nonetheless, the participants left with the understanding that Dr. Meinhold would begin training the staff the next week. That training session was later canceled, according to Mr. Greiner, because of recent snow days.

After the meeting, Mr. Greiner realized that the staff did not think DTT was a good program for B.J. Mr. Greiner met privately with his staff on April 16 and 26, 1996 to discuss DTT and develop a new proposal. A proposal was drafted and sent to the parents, with goals similar to those proposed by Dr. Meinhold, but without any DTT. Instead, the proposal placed B.J. in a mainstream kindergarten class with one-to-one support from a trained paraprofessional.

An IEPC was scheduled for May 17, 1996, to which Dr. Meinhold was not invited. At the May IEPC, plaintiffs had serious concerns about placing B.J. in a mainstream kindergarten program without any DTT and discussed why the proposal differed from the March proposal for B.J. According to defendants, Mr. Greiner tried to explain the rationale for the proposal, but the parents were not interested in hearing details. Plaintiffs signed the IEPC, noting their disagreement, on May 23, 1996.

Pursuant to the IDEA, the parents requested an impartial due process hearing before a local hearing officer ("LHO"). The LHO decided in favor of B.J.'s parents, finding that the March 1996 oral proposal was an IEP that should be implemented, and directing the district to reimburse the parents for the expenses of providing DTT at home. Both parties appealed aspects of the decision. The state hearing review officer ("SHO") reversed the LHO, finding that no IEP had been created in March and the May IEP was valid. The SHO determined that the May IEP was developed without procedural or substantive violations and provided a free appropriate public education ("FAPE") designed to maximize B.J.'s potential, in accordance with federal and state law. The SHO also denied reimbursement to the parents.

Plaintiffs filed a complaint in district court appealing the SHO's determination and alleging violations of the IDEA, the Rehabilitation Act of 1973, the Americans with Disabilities Act, 42 U.S.C. § 1983, and the Michigan Handicappers' Civil Rights Act. Defendants filed a motion for summary judgment addressing all counts of the complaint; plaintiffs filed a motion for partial summary judgment addressing their IDEA claim. The district court granted defendants' motion and denied plaintiffs' motions for partial summary judgment and for reconsideration. The court determined that the parents had the burden of proof. Looking at specific issues raised, the court first held that the timing of B.J.'s recertification as autistic was acceptable. Second, the court determined that the district had conducted a proper evaluation of B.J. and the professionals involved were qualified. Third, the court found that B.J.'s parents were sufficiently included in the IEPC process. Fourth, the court found that the district's proposal was designed to address B.J.'s unique needs. Finally, after an independent review of the evidence, the court agreed with the SHO that the May IEP allowed B.J. to attain his maximum potential. Because the school's IEP was appropriate, the court held that the parents were not entitled to reimbursement. The court dismissed the remaining claims, holding that they failed because the court had found in defendants' favor as to the IEP.

The district court apparently believed that the parties had submitted the case for review of the administrative decision on the record. Because plaintiffs dispute that the case was submitted in that manner, we will treat the cause as having been submitted on summary judgment.

## II.

### A.  Standard of Review

The IDEA was designed to give children with disabilities a free appropriate public education designed to meet their unique needs. *See* 20 U.S.C.A. §§ 1401(a)(16), 1412 (West 1990) (current versions at 20 U.S.C.A. §§ 1401(25), 1412 (West 2000)); *see also Renner v. Board of Educ.*, 185 F.3d

placement options were not considered. Both the LHO and the SHO determined that the evaluation was adequate. Plaintiffs have not made a persuasive argument otherwise, especially considering the district had before it previous evaluations of B.J. and Dr. Meinhold's report. Nor have plaintiffs shown how there is a genuine issue of material fact as to whether B.J. needed a new evaluation before developing his May 1996 IEP. As the district court pointed out, B.J. was evaluated in early 1996 and "neither plaintiffs nor defendants argue that a new evaluation would have yielded different results."

### 5.  Timely Recertification of B.J.

Plaintiffs also maintain that defendants failed to timely recertify B.J. by waiting until 1996 to certify him as autistic, even though defendants knew he was diagnosed as autistic in 1994. Defendants dispute the date they learned of B.J.'s autism diagnosis. Plaintiffs cite the portion of the IDEA that sets out the requirements for an application for funds under the IDEA. One of the requirements is that a state or local educational agency "provide satisfactory assurance that payments . . . will be used for excess costs directly attributable to programs which . . . provide that all children . . . who are handicapped . . . and are in need of special education and related services will be identified, located, and evaluated." 20 U.S.C.A. § 1414(a)(1)(A) (West 1990) (current version with differences in language at 20 U.S.C.A. § 1414 (West 2000)). This statutory provision does not indicate specific time periods for such evaluation. There are also no time requirements in the Michigan rule relied upon by the district court. *See* Mich. Admin. Code r. 340.1711 (Supp. 1983). In relevant part, that rule states:

"Preprimary impaired" means a child through 5 years of age whose primary impairment cannot be differentiated through existing criteria within R 340.1703 to R 340.1710 or R 340.1713 to R 340.1715 and who manifests an impairment in 1 or more areas of development equal to or greater than ½ of the expected

preponderance of the evidence" that the district's staff members were unqualified. The district court reviewed the qualifications of the district's staff and concluded that there was "no evidence" they were unqualified. This holding indicates that plaintiffs did not meet their summary judgment burden of coming forward with evidence to create a genuine issue as to qualifications. Plaintiffs have failed to suggest on appeal how they would demonstrate a genuine issue. Therefore, while the district court cited the wrong standard, the holding was correct.

The parties also engage in a debate over whether Michigan's "maximum potential" standard requires the district to hire "top-notch consultants" and to have personnel knowledgeable about programs related to the needs of every disabled child. Because plaintiffs have failed to raise a genuine issue as to whether there were personnel knowledgeable about DTT at the meeting and failed to argue whether Dr. Meinhold would be a top-notch consultant, we decline to address the argument.

### 4. Evaluation of B.J. Before IEP

Plaintiffs argue that the district did not conduct a required comprehensive evaluation of B.J. before making a significant change in his placement.[4] Assuming that there was a proposed significant change in placement, we must address whether the evaluation in February 1996 was adequate. Plaintiffs maintain it was inadequate because B.J. was evaluated solely for the purpose of recertification and

---

[4]Plaintiffs assert that the change in placement was from B.J.'s home DTT program to a fully mainstreamed school program. They cite no support for their assertion that the home DTT was B.J.'s previous placement. The record indicates that B.J. was subject to an IEP developed in October, 1994, but B.J.'s parents unilaterally reduced his school participation in 1995. On the other hand, defendants fail to explain why the change from the 1994 IEP to the 1996 IEP would not be a significant change in placement. *But cf. Dong*, 197 F.3d at 801 (noting SHO's finding that a change in placement from a half-day to a full-day is typical when a child turns five years of age).

635, 644 (6th Cir. 1999). There are two parts to a court's inquiry in suits brought under 20 U.S.C.A. § 1415(e)(2) (West 1990) (current version at 20 U.S.C.A. § 1415(i)(2) (West 2000)). First, the court determines whether the state has complied with the procedures set forth in the IDEA. *See Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). Second, the court assesses whether the IEP developed through the act's procedures is reasonably calculated to enable the child to receive educational benefits. *See id.* at 206-07. Michigan has added to this standard by requiring that an IEP be designed to develop the "maximum potential" of a child. Mich. Comp. Laws. Ann. §§ 380.170(a), 380.170(a), 380.1711(17)(a), 380.1751(1) (West 1997).

This court reviews both the procedural and substantive matters under a standard of "modified de novo review." *Renner*, 185 F.3d at 641; *see Metropolitan Bd. of Pub. Educ. v. Guest*, 193 F.3d 457, 463-64 (6th Cir. 1999). This standard of review stems from the Supreme Court's holding that courts must give "due weight" to the state administrative proceedings. *Rowley*, 458 U.S. at 206. In *Rowley*, the Court looked at the procedural safeguards in the IDEA that indicated that a court "shall receive the record [*sic*] of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* at 205 (quoting 20 U.S.C.A. § 1415(e)(2) (West 1990)). The Court held that "[t]he fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Id.* at 206.

This court has not elaborated on the meaning of "due weight." *See, e.g., Doe v. Metropolitan Nashville Pub. Sch.*, 133 F.3d 384, 386-87 (6th Cir.), *cert. denied*, 119 S. Ct. 47 (1998) (declining to resolve the meaning of due weight

definitively).[1] We have held that a court cannot simply adopt the state administrative findings without an independent re-examination of the evidence. *See id.* We have also indicated that the weight due will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings.

With regard to procedural matters, a court should "strictly review an IEP for procedural compliance," although technical deviations will not render an IEP invalid. *Dong v. Board of Educ.*, 197 F.3d 793, 800 (6th Cir. 1999); *see also Doe v. Defendant I*, 898 F.2d 1186, 1190-91 (6th Cir. 1990). The Supreme Court has emphasized the importance Congress attached to the IDEA's procedural safeguards:

> [T]he congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the

---

[1] Other circuits have adopted a variety of interpretations of "due weight." *See, e.g., Adams v. Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999) (courts, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue; after such consideration the court is free to accept or reject the findings in part or in whole, bestowing increased deference upon the hearing officer where her findings are thorough and complete); *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997), *cert. denied*, 523 U.S. 137 (1998) (the level of deference is less than required under the substantial evidence test, but consideration should be given to the state hearing panel's opportunity to observe the demeanor of the witnesses); *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993) (court's review is "virtually de novo"); *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1992) (findings of fact are entitled to be considered prima facie correct; the court must explain its reasons if it will not follow the findings); *Doe v. Alabama State Dep't of Educ.*, 915 F.2d 651, 657 n.3 (11th Cir. 1990) (the extent of deference to be given the administrative findings of fact is an issue left to the discretion of the district court; the court must consider the administrative findings of fact, but is free to accept or reject them).

views through letters and telephone conversations with district staff. *Cf. Dong*, 197 F.3d at 802 (finding that parents were afforded opportunity to participate, despite school district's failure to reconvene an IEPC after receiving a letter from parents, when parents attended and expressed their views at two IEPCs). Furthermore, plaintiffs have cited no support for their implicit assertion that schools may never discuss a child's IEP, goals, objectives, or educational methodology out of the presence of the parents. For these reasons, plaintiffs have failed to demonstrate that they were denied participation in the IEPC process.

### 3. *Qualifications of District Staff*

Plaintiffs also argue that the district failed to consult with knowledgeable professionals regarding B.J.'s placement as required by IDEA regulations. *See* 34 C.F.R. § 300.533(a)(3) (1996) (current version at 34 C.F.R § 300.533 (1999)) (requiring that the school district "[e]nsure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options"). Plaintiffs maintain that because they preferred Lovaas-style DTT therapy, at least one decision-maker should have been well-versed in that treatment. More specifically, plaintiffs argue that the district should have, but did not, consult Dr. Meinhold.

This court has rejected "the contention that [a school district] must include an expert in the particular teaching method preferred by the parents in order to satisfy the requirement that the IEPC include persons knowledgeable about 'placement options.'" *Dong*, 197 F.3d at 801; *see also Renner*, 185 F.3d at 644. Furthermore, the record indicates that Marianne Miller, a teacher consultant for the district, had experience using DTT. The district also had Dr. Meinhold's report and was able to consider it at the IEPC. *See Dong*, 197 F.3d at 801 (noting that the IEPC had a report from plaintiffs' speech therapist, who utilized DTT).

Plaintiffs also point out that the district court used the wrong standard when it found they had failed to prove "by a

### 1. Existence of March 1996 IEP

Plaintiffs argue that the district court erred in determining that there never was a March 1996 IEP. They maintain that despite the absence of a written document the evidence shows that Mr. Greiner did not intend his proposal to be tentative and planned to implement the IEP. Federal law and Michigan regulation, however, both indicate that an IEP is a written document. *See* 20 U.S.C.A. § 1401(a)(19) (West 1990) (current version at 20 U.S.C.A. § 1401(11) (West 2000)); Mich. Admin. Code r. 340.1721e (Supp. 1995). Therefore, plaintiffs cannot prevail on their claim that an IEP existed in March when there was no written document until May. Plaintiffs' suggestion that the doctrine of promissory estoppel should apply to Mr. Greiner's statements in the March meeting is equally unpersuasive. Congress created specific procedures under the IDEA for developing an IEP, which include a review process should a party such as plaintiffs be dissatisfied with the eventual IEP or the delay in creating one.

### 2. April 16 & 26 Meetings

Next, plaintiffs argue that they were denied meaningful parental participation in the IEPC process because they were not invited to two meetings in April 1996. *See* 34 C.F.R. § 300.345, 34 C.F.R. § 300, app. C, No. 26 (1996) (current versions at 34 C.F.R. § 300.345, 34 C.F.R. § 300, app. A, No. 5 (1999)). Defendants counter that the meetings on April 16 and 26 were staff meetings that plaintiffs were not entitled to attend. The SHO and district court agreed with defendants' characterization of the meetings and plaintiffs do little to suggest that the meetings were in fact IEP meetings. *Cf.* 34 C.F.R. § 300, app. C, No. 55 (1996) (current version at 34 C.F.R. § 300, app. A, No. 32 (1999)) (indicating that district staff may prepare information before meeting with parents). Plaintiffs have not indicated how they were prevented from participating in the development of the IEP. The parents attended a December 1996 IEPC, strongly expressed their views at the March 1996 IEPC, had the opportunity to participate in the May 1996 IEPC, and also expressed their

procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley*, 458 U.S. at 206. Furthermore, "[i]f the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." *Dong*, 197 F.3d at 800.

As for substantive issues, "[t]he 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *See Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley*, 458 U.S. at 206). The Supreme Court has pointed out that:

> In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

*Rowley*, 458 U.S. at 207 (footnote omitted). Indeed, federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field. *See Renner*, 185 F.3d at 641; *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 398-99 (6th Cir. 1998) (noting that the due weight standard of review "militates against second guessing the educational expertise of the administrative officers and conclusions predicated upon these [*sic*] expertise").

Therefore, when reviewing an IEP we must keep in mind that the state and local educational agencies are deemed to possess expertise in education policy and practice. The focus of the Supreme Court and this court upon the presumed

educational expertise of state and local agencies leads to the conclusion that the amount of weight due depends upon whether such expertise is relevant to the decision-making process. As a result, less weight is due to an agency's determinations on matters for which educational expertise is not relevant, so that a federal court would be just as well suited to evaluate the situation. More weight is due to an agency's determinations on matters for which educational expertise would be relevant. Furthermore, while the court may not substitute its own view for that of the state and local educational agencies, *see Rowley*, 458 U.S. at 206-07, the deference due to the administrative findings is less than that generally accorded to administrative decisions, whereby the court will uphold a decision if it is supported by "substantial evidence." *See* 5 U.S.C.A. § 706 (West 1996); *cf. Rowley*, 458 U.S. at 205 (discussing legislative history of IDEA rejecting substantial evidence standard).

This court recently described the substantial evidence test as one in which an agency's findings would be set aside only when the record clearly precludes the administrative decision from being justified by a fair estimate of the worth of the testimony of witnesses, the agency's informed judgment on matters within its special competence, or both. *See Loral Defense Sys.-Akron v. NLRB*, 200 F.3d 436, 448 (6th Cir. 1999). Because administrative findings in IDEA cases should be afforded less deference than that given to agencies under the substantial evidence test, and in view of the IDEA's preponderance of the evidence standard, we hold that administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both. A court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable. By so deferring, "due weight" will have been given to the state administrative proceedings. We also reiterate that, when there is a conflict between the holdings of the local and state hearing officers, the court must

defer to the state hearing officer's decision in reviewing the record on appeal.[2] *See Renner*, 185 F.3d at 641 (holding that court must defer to the final decision of the state authorities).

In a case involving a motion for summary judgment, the court should still apply modified de novo review, but must ensure that there are no genuine issues regarding the facts essential to the hearing officer's decision. *See Metropolitan Nashville Pub. Sch.*, 133 F.3d at 387. In rendering its decision, the court may still rely upon the hearing officer's presumed educational expertise, as long as the material facts underlying the officer's determination are not in dispute.[3]

*B. Discussion*

Plaintiffs raised numerous issues in their brief. With regard to procedural matters, plaintiffs argue that an IEP was finalized in March, not May, of 1996; two meetings in April 1996 were IEPC meetings from which the parents were excluded; the school district failed to consult with knowledgeable professionals regarding B.J.'s placement; he was not properly evaluated; and he was not timely recertified as autistic. Plaintiffs contend that even if the procedural requirements of the IDEA were met, the IEP was substantively invalid because it failed to address B.J.'s unique needs and was not designed to allow him to attain his maximum potential. Each issue will be addressed in turn.

---

[2] Plaintiffs spent some time arguing this point in their briefs, but we see no need for further discussion in light of this court's prior holdings on this point.

[3] Because we treat this case as submitted on summary judgment, plaintiffs' arguments on appeal as to who bears the burden of proof are irrelevant. Moreover, as we recently held, the party challenging the terms of an IEP should bear the burden of proving that the placement was not appropriate, even in a case involving Michigan's maximum potential standard. *See Dong*, 197 F.3d at 799-800.